Matthew L. Walters, ISB #6599
Jaclyn T. Gans, ISB #9291
ELAM & BURKE, PA
251 E. Front Street, Suite 300
Post Office Box 1539
Boise, ID 83701
Telephone: (208) 343-5454
mlw@elamburke.com
jtg@elamburke.com

Usama Kahf, CSB #266443 (*Pro Hac Vice to be filed*)
Andrew Gallinaro, PSB #201326 (*Pro Hac Vice to be filed*)
Darcey Groden, CSB #296492 (*Pro Hac Vice to be filed*)
FISHER & PHILLIPS LLP
2050 Main Street, Suite 1000
Irvine, CA 92614
Telephone: (949) 798-2118
ukahf@fisherphillips.com
agallinaro@fisherphillips.com
dgroden@fisherphillips.com

Attorneys for Plaintiff AssuredPartners of Colorado, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ASSUREDPARTNERS OF COLORADO, LLC<br><br>Plaintiff,<br><br>v.<br><br>COMMERCIAL INSURANCE ASSOCIATES, LLC, BRYCE W. EDDY, and DANIEL ASHBROOK,<br><br>Defendants. | Case No.<br><br>PLAINTIFF ASSUREDPARTNERS OF COLORADO, LLC'S MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY |

PLAINTIFF ASSUREDPARTNERS OF COLORADO, LLC'S MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY - 1

## I.    INTRODUCTION

Bryce Eddy ("Eddy") and Daniel Ashbrook ("Ashbrook") moved two of the largest clients they managed on behalf of AssuredPartners of Colorado, LLC ("AP") on July 1, 2025 to a competitor called Commercial Insurance Associates, LLC ("CIA"):



Problem is: Eddy and Ashbrook were still employed by AP on July 1st. It wasn't until 2:30 p.m. on July 2, that Eddy's employment with AP was terminated, and Ashbrook's resignation on July 1 was effective that day, not immediately when he resigned that morning. The above is one of four such notices AP has received, and the list is growing. But these egregious acts of disloyalty are only the tip of the proverbial iceberg – an iceberg that will continue to cause AP to suffer irreparable harm if not avoided by this Court's injunction powers. AP is at imminent risk of loss of client relationships and goodwill and misappropriation of its confidential information, as the unlawful conduct is ongoing, and includes the following, among other examples:

- Seven AP employees coordinating with each other and with CIA to all leave at the same time without any notice (five resigned within 20 minutes of each other and about 21 hours after all seven had a conference call to coordinate their exit, all on AP's dime and using

PLAINTIFF ASSUREDPARTNERS OF COLORADO, LLC'S MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY - 2

AP's systems). Their loyalties had switched to CIA at least a week before, if not earlier, based on evidence they left in their AP email such as onboarding paperwork with CIA and the fact that Eddy had virtually stopped doing any work for AP.

- Two of the seven overlapped in their employment with AP and CIA, meaning they were double agents for a time, unbeknownst to AP. During this time, they convinced at least two clients to transfer their business to Eddy at CIA and they spoke with a third client who reported to AP that neither of them had informed him that they were already employed by CIA, so he believed they were talking to him on AP's behalf.

- The former AP employees solicited existing clients while still employed by AP for the benefit of CIA. They also held Google Meetings with prospective clients without logging any of the prospect information in AP systems as required—clear evidence that their work on those leads was for CIA.

- About two hours before five of them resigned, the lead account manager for a key client emailed the client to postpone the submission of requests for quotes to carriers for the next policy year – to make sure those requests could be submitted after joining CIA as opposed to on AP's behalf.

- They reached out to dozens of clients right before leaving AP about setting up future meetings for the clients' insurance renewals, knowing that within mere days they would cease to be AP employees.

- Several members of the team deleted large swaths of their files and emails just before leaving in an effort to cover their tracks.

- Eddy used his AP credentials to access an insurance carrier portal while still employed by AP and attempted to change the carrier's appointed broker to CIA for all of AP's clients that were assigned to him.

- The seven-member team managed a book of business at AP of about $2.5 million in annual commission. With a high overhead of over $1.5 million in annual payroll for all seven,

there is no way that CIA would hire this entire team together without planning, preparation, coordination, and discussions about the portability of the book of business and assurances that clients will follow the team.

- The timing of the team's departure right before the holiday was clearly intended to give Defendants a head start while many people are out for a long weekend. Indeed, not a single member of the team turned in their computer upon resignation. Instead, they continue to dribble in, with Eddy's and Nunez's not even being sent yet, a deliberate attempt to delay forensic review of their AP devices.

These facts reflect a coordinated and unlawful scheme by Eddy and Ashbrook, in concert with CIA and the other members of Eddy's team, to misappropriate AP's employees, clients, and goodwill. In just days, CIA already succeeded in converting over one-quarter of the book of business these employees managed on AP's behalf.

These actions, carried out while the former AP employees were still employed by AP and with CIA's active encouragement, represent serious breaches of fiduciary duty and tortious interference with AP's client relationships. The result has been immediate and irreparable damage to AP's business, including harm to its goodwill, client relationships, and internal stability. The loss of trusted employees and the disruption to longstanding client accounts cannot be fully measured in monetary terms. Immediate relief is necessary to prevent further erosion of AP's client base and to preserve the status quo while this case proceeds.

## II.    STATEMENT OF FACTS

AP is a wholly owned subsidiary of AssuredPartners Capital, Inc., a leading national brokerage firm founded in 2011 as a partnership of leading independent property, casualty, and employee benefits brokerages firms. Declaration of Tom Harper ("Harper Decl."), ¶ 8. As an insurance brokerage AP facilitates the sale of insurance policies between client insureds and

insurance carriers. *Id.* ¶ 9. Insurance brokerages operate through their producers – individuals who are licensed to sell insurance policies. Producers, in turn, have account executives or staff who work with them to assist with paperwork, completing transactions, and day-to-day servicing of clients. *Id.*

In February 2018, AP acquired Tolman & Wiker Insurances Services, LLC of Ventura, California. As part of the acquisition, Eddy and his team transferred their employment to AP. *Id.* ¶ 10. Eddy is an Idaho-based insurance broker licensed with the State of California. Eddy and his team specialize in employee benefits and, since the acquisition, he held the title of Executive Vice President. Eddy, as the head of the team, is known as a "producer" in insurance industry lingo. *Id.* Producers leverage their expertise and AP's national resources to generate new business, whether through relationships with new clients or through sales of new lines to existing clients. *Id.* More generally, Eddy was the "relationship guy" – his job was to meet with clients, maintain relationships, and bring business in for AP, and he was less involved in the operational-side of things – i.e., hammering out the nuts and bolts of the deals and servicing the account. *Id.* Rather, that was for the rest of his team. *Id.*

A critical element to AP's success is its investment in recruiting, developing, training, and retaining a stable workforce to support producers such as Eddy and thus support AP's clients. *Id.* ¶ 11. This staff helps manage client relationships and perform the more day-to-day tasks necessary in obtaining and maintaining insurance coverage, such as obtaining necessary client information, identifying insurers who provide the necessary insurance and obtain quotes, communicating quotes to clients, and completing necessary paperwork when an insurer is chosen. *Id.* Employee retention and workforce stability provides AP's clients with continuity of service and coverage by a dedicated team and helps establish and maintain client loyalty. *Id.* Through these efforts, AP enjoys

a reputation for strong customer service and satisfaction through which AP maintains a strong expectation of continued business with its clients. *Id.*

AP enjoys above average retention rates for employees and clients. *Id*. ¶ 58. AP has an established process for transitioning accounts when producers leave, for retirement or otherwise. *Id*. When AP has notice of an impending transition, AP utilizes a "Relationship Manager" role and process to wind down and transfer relationships to other producers or to service team members. *Id*. When producers are leaving for a competitor and provide advance notice, AP typically goes through the client list with the outgoing producer and service teams to ensure a quick, but thoughtful transfer of information to protect the clients and try to reduce expenses and overhead. *Id*. These procedures are effective. For example, in a recent departure AP retained 99% of the clients serviced by the departing producer, and more than 97% of the associated revenue. *Id*.

Eddy and Ashbrook worked with a team of five (5) other employees located in California who also supported Eddy. *Id*. ¶ 12. They were: Mary Valdivieso, Account Executive; Ryan Turnbull, Director of Wellness; Maria Zaragoza, Account Manager; Katie Lin, Account Manager; and Anamaria Nunez, Account Manager. *Id.* With the exception of Nunez (who was hired after the acquisition), all of these employees transitioned over to AP after the acquisition of Tolman & Wiker. *Id.* ¶ 12-13. Valdivieso was the key account manager for most of the book of business at issue and had the most day-to-day responsibility for managing those relationships. *Id*. ¶ 12.

Together, Eddy, Ashbrook and their team managed roughly $2.5 million in business on behalf of AP, and were compensated handsomely for doing so (together, approximately $1.1 million annually). *Id*. ¶ 55. That business was acquired both through AP's purchase of Tolman & Wiker, and through AP's substantial investments in marketing and in business development opportunities for Eddy, Ashbrook, and their team. *Id.*

PLAINTIFF ASSUREDPARTNERS OF COLORADO, LLC'S MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY - 6

CIA is a competitor in the insurance brokerage industry and describes itself as one of the "Nation's largest independent insurance brokers" specializing in property and casualty insurance as well as risk management services.[1] CIA advertises that it is licensed in all 50 states and that its "client portfolio ranges from publicly held companies to local start-up ventures."[2]

### A. Defendants Conspire to Coordinate a Mass Defection to CIA.

AP is currently not aware exactly when CIA began to recruit Eddy, Ashbrook, and their team, but, based on information found in employee email inboxes, Eddy, Ashbrook, and the team transferred their loyalty to CIA no later than June 24, 2025. *See* Harper Decl. ¶¶ 15-20. Valdivieso's inbox contained a draft email with an attachment titled "Onboarding Documents.gz.zip." *Id.* ¶ 16. The attachment contained an EDD Employee's Withholding Allowance Certificate signed by Valdivieso on June 24, 2025, and listing CIA as the employer, (2) an I-9 filled out with Valdivieso's information, and (3) a W-4 Employee's Without Certificate signed by Valdivieso on June 24, 2025. *Id.* ¶ 17. **The W-4 listed Valdivieso's first date of employment with CIA as July 1, 2025.** *Id.* ¶ 17(b). On June 23 and 24, 2025, Turnbull forwarded from his AP email account to his personal email several personal emails that he had received at his AP email account months ago, which indicates preparation to leave AP as he was making sure he still had access to those emails. *Id.* ¶18. The next day, on June 25, 2025, Ashbrook emailed himself from his work email to his personal email a summary of when PTO is payable upon separation of employment and attached a copy of AP's employee handbook. *Id.* ¶ 19. AP has also found similar emails sent by Zaragoza in mid-June in which she suddenly digs up old emails and personal records and forwards them to her personal email. *Id.*20. The timing of all these emails is

---

[1] See https://www.com-ins.com/.
[2] See https://www.linkedin.com/company/commercial-insurance-associates/about/.

PLAINTIFF ASSUREDPARTNERS OF COLORADO, LLC'S MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY - 7

not a coincidence; these employees had already decided to leave and accepted offers from AP by June 24 or earlier. *Id*.

With the exception of Eddy (who did not notify AP of his new employment until *after* announcing it on LinkedIn and being directly confronted by AP), the entire team sent resignation emails on July 1, 2025, announcing their resignations to AP management. *Id*. ¶¶ 36-42. Five of them sent their resignations within 20 minutes of each other in the morning, and the sixth sent her resignation later that evening. *Id*. All six resignations submitted on July 1 were "effective today" not immediately, meaning their employment continued with AP till the end of July 1st. *Id*.

Many of the resignations used the same structure in the same exact order: announcing the resignation, thanking AP for the opportunities with them, acknowledging that access to AP systems would be terminated, requesting that instructions to return AP equipment be sent to the individual's personal email, and providing directions for final pay and documents (including a home address). *Id.* ¶¶ 36-40, 42. The resignations of Ashbrook and Lin went a step further than just parallel structure with similar wording; they were nearly word-for-word identical. *Id.* ¶¶ 36-37.

The next day (while Eddy was still employed by AP), CIA issued a press release touting its acquisition of AP's employees as part of a new effort to expand its employee benefits practice:

> CIA, one of the nation's largest property and casualty insurance brokers, has expanded its Employee Benefits practice area with the launch of a West Coast office led by industry veteran Bryce Eddy. […] Eddy and his six-person team, which includes seasoned employee benefits professionals Mary Valdivieso and Ryan Turnbull will be based in Los Angeles. They join CIA from Assured Partners, and will be working closely with the Nashville-based Employee Benefits group…, as well as focusing on talent recruitment to build out the company's West Coast presence.

*Id.* ¶ 43.

To bring on a team of this size, including non-producing administrative personnel, a

brokerage such as CIA would have required assurance from Eddy, Ashbrook, and their team of their ability to transition existing clients and bring portable business to CIA. *Id*. ¶ 58. CIA must have offered the team better compensation than they were making at AP in order to lure them to CIA, and the team's total compensation at AP was projected to exceed $1.5 million in 2025 (collectively, the seven of them have been paid over $750,000 in wages and commissions since January 1, 2025). *Id*. ¶ 57. There is no way that a brokerage like CIA would have hired this team of seven without having discussed with the team (or at least with the key members of the team who hold the key to client relationships) the portability of the book of business they were managing for AP and the plan for transitioning clients to AP. *Id.* ¶ 58. While the movement of individual brokers between brokerages is common in the insurance industry, the mass defection of entire teams, including their administrative staff, is not. *Id.*

## B. Eddy, Ashbrook, and Their Team Did Substantial Work on Behalf of CIA While Still Employed by AP.

To ensure their ability to transition clients, Eddy, Ashbrook and their team performed substantial work on behalf of CIA while still employed by AP to gain an unfair competitive head start on their efforts to transition clients. For example, on Thursday, June 26, 2025 – less than a week before Eddy's entire team would resign and two days after Valdivieso signed onboarding paperwork with CIA – Valdivieso sent emails to at least 23 AP clients, all of which stated in relevant part: "We're almost at that time of the year again when we'll start working on your renewals for the next policy year. [¶] We will be reaching out soon to schedule a pre-renewal discussion and go over everything in greater deal." Harper Decl. ¶ 21. Eddy was copied on all of these emails, and he responded to some of the emails in which clients wrote back. *Id.* ¶¶ 21-27. The same day, Valdivieso punted a client insurance request and promised to follow up – despite

knowing that the entirety of Eddy's team would be at CIA at that point. *Id.* ¶ 29. Based on review of Eddy's AP email account and network logs showing when he accessed AP's network, Eddy stopped virtually all work on behalf of AP as of June 26, 2025 after Valdivieso's email blast. *Id.* ¶ 28. At least from this date forward, all of Eddy's efforts were directed toward and on behalf of CIA, though he remained an AP employee until July 2. *See id.* ¶¶ 21-55.

In fact, Eddy's team knew that they would not be reaching out on behalf of AP – none of them would be employed by AP in a week's time. Harper Decl. ¶¶ 15-20. Moreover, there was no business need on behalf of AP to send what was essentially a *pre*-pre-renewal email to notify clients that they would reach out to send out another email shortly to set up a pre-renewal discussion, all for renewals that were several months away. *Id.* ¶ 21. However, this email did serve a purpose for CIA: that Defendants would have a convenient list of contacts to send a blast announcement of their transition on July 2, 2025, the day after the mass resignation.

On June 27, 2025, Ashbrook deleted a large number of files from his computer, and Valdivieso did the same on June 30, 2025 – likely either to cover up evidence of wrongdoing, or to make it more difficult for AP to service clients. *See Id.* ¶¶ 30-31.

On June 30, 2025, the day before the mass-resignation, at around 11:45 a.m. MST, Ashbrook and Valdivieso participated in a 10-minute call. Harper Decl. ¶ 35. Right after that, at around 12:00 p.m. MST, Eddy and Ashbrook organized and/or participated in a conference call with all seven members of their team that lasted approximately 12-15 minutes. *Id.* It is clear that Eddy, Ashbrook, and their team used this call to coordinate their transition to CIA given that: (1) five of participants of this call resigned about 21 hours later within 20 minutes of each other, the sixth resigned about 35 hours after the call, and both Eddy and Valdivieso officially began their employment on July 1 while they were still employed by AP; and (2) there are no records in AP

systems showing that Eddy was conducting any AP business at this time. *See id.* ¶¶ 28, 34-46.

Also on June 30, Eddy (using a personal email account) together with Turnbull participated in a Google Meeting (with the subject "broker mtg") with a company that is not an AP client, indicating it was for the purpose of soliciting new business. *Id.* ¶ 34. AP requires its employees to log these types of meetings in a CRM system, in addition to maintaining customer pipeline reports. *Id.* Eddy did not do so in this instance, and given the timing, this indicates that he and Turnbull were prospecting business for CIA, both while still employed by AP. *Id.*

On July 1, 2025 at 6:35 a.m., Valdivieso emailed a client from her AP email account to postpone a request for quotes from insurers. This was done so that the group could obtain those quotes once they had transitioned to CIA and convert that business to their new employer. *See* Harper Decl. ¶¶ 32-33. Later that same morning, between approximately 9:00 – 9:20 a.m., Ashbrook along with Valdivieso, Turnbull, Zaragoza, and Lin submitted their resignations to AP management. *Id.* ¶¶ 36-40. Nunez submitted her resignation that evening at 11:33 p.m. *Id.* ¶ 42.

Notably, Eddy did not resign with the rest of his group on July 1. Harper Decl. ¶¶ 36-40, 42. AP management reached out to Eddy after receiving the first five resignations to discuss coverage for the clients serviced by those employees but received no response. *Id.* ¶ 41. However, Eddy did post an announcement to LinkedIn sometime between 12:00-1:00 p.m. that he had joined CIA. *Id.* ¶ 42. AP did not discover this post for several hours, at which point it acted swiftly to terminate his access to AP's network and invalidate his AP credentials with insurers, though not to terminate his employment just yet to give him an opportunity to confirm the post on social media and resign. *Id.* ¶¶ 42, 44. Unfortunately, as set forth below, this did not occur fast enough to prevent Eddy's abuse of those credentials. AP then reached out to Eddy using his personal email summarizing his failure to respond to the prior email about the resignation of his team and

LinkedIn announcement of employment with CIA and terminating Eddy's employment with AP. Harper Decl. ¶ 44. Eddy falsely responded that he had submitted his resignation using his AP email account. *Id.* ¶ 45. However, AP management never received the resignation, and AP has found no evidence of the alleged email being sent by Eddy after a thorough search of Eddy's sent emails, including any emails left in draft mode. *Id.* ¶ 46. In fact, it was through that search that AP discovered Eddy's AP email account had gone virtually silent as of June 26, 2025. *Id.* ¶ 28.

More remarkable still, despite claiming he had resigned on July 1, and Valdivieso actually resigning on July 1, AP has since learned from a client that Eddy and Valdivieso had a conference call in the evening of July 1 with an AP client to address the client's concern on the funding requirement for a particular policy. Harper Decl. ¶ 53. Neither advised the client that they were now working for CIA. *Id.*. In this way, they attempted to maintain their relationship in order to increase the likelihood the client would execute a BOR change letter once presented.

Yet, there can be no doubt that Eddy was simultaneously working for CIA as of July 1, 2025. Defendants have submitted four BOR letters – at least two of which and likely all were signed by the insured clients on July 1, 2025 – to an insurer switching the broker of record for those clients to CIA, stating that the client "appoint[ed] Bryce W. Eddy **of Commercial Insurance Associates, LLC**, as our official and exclusive Employee Benefits Broker of Record on all our carrier plans." *Id.* ¶ 51 (bolding added). Eddy had neither resigned nor been fired at that time – again he was not terminated until 2:30 p.m. on July 2. *Id.* And Ashbrook who participated in obtaining and submitting those July 1 BOR letters was also still employed by AP on July 1st. *Id.* ¶ 36. The next day, on July 2, 2025, less than an hour after AP terminated Eddy's employment, Ashbrook emailed an insurance carrier a BOR letter for another client appointing Eddy and CIA as the client's broker. *Id.* ¶ 52. This letter could not have been obtained at such speed absent Eddy,

Ashbrook, and the rest of the team starting to transfer clients ahead of the end of their employment with CIA. *See id.* ¶¶ 47-48.

### C. **Eddy Misused his AP Credentials to Access Anthem's Online Platform in an Effort to Steal Clients Before Resigning.**

During the critical hours on July 1, 2025, when Eddy had apparently already begun his new employment with CIA (but before he resigned and/or was terminated from AP on July 2), he used his AP credentials to access the online platform of Anthem Insurance, one of the largest Blue Cross Blue Shield carriers in the country and the insurer for many of AP's clients. Declaration of Laura Earley ("Earley Decl.) ¶¶1-11. AP has an "appointment" with Anthem, which means it is an approved broker that is authorized to sell its insurance products. *Id*. ¶5. Without an appointment, a broker cannot sell or service Anthem policies. *Id*. ¶¶4-5. Using his AP access on July 1, Eddy submitted a broker change request with a July 2 effective date, changing his tax ID from a number affiliated with AP, to a non-AP number presumably affiliated with CIA. *Id*. ¶8. While AP discovered this and took steps to prevent it, had the broker change request been fully processed and accepted by Anthem, then **all** of the AP clients with Anthem policies for whom Mr. Eddy was designated as broker would have been transferred to whatever business entity was associated with Mr. Eddy's new tax ID. *Id*. ¶10. Through this conduct, Eddy attempted to bypass the normal process for a client-initiated request to change brokerages.[3] *Id*. ¶9.

### III.    ARGUMENT

The standard for obtaining a temporary restraining order and preliminary injunction is identical: AP "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor,

---

[3] Additionally, if CIA were not already appointed with Anthem, this change would have allowed Eddy to continue working with Anthem even though his new employer was not authorized to do so. *Id*. ¶11.

and that an injunction is in the public interest." *All. for Wild Rockies v. Higgins*, 690 F. Supp. 3d 1177, 1185 (D. Idaho 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). Alternatively, AP may obtain equitable relief under the "sliding scale" approach if "'serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor,' combined with a likelihood of irreparable injury and a showing that the order would serve the public interest." *Id.* (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011)). These factors all tip decidedly in favor of AP. Therefore, an immediate temporary restraining order is warranted and necessary to preserve the status quo and to protect AP's legitimate business interests, followed by a preliminary injunction after a limited expedited discovery period.

   **A.  <u>AP is Likely to Succeed on its Claims.</u>**

   AP seeks preliminary injunctive relief action based on its claim against Eddy and Ashbrook for Breach of Duty of Loyalty, and its claim against all Defendants for Intentional Interference with Prospective Economic Advantage.[4] As set forth below, AP is likely to succeed on both claims.

   *1.  Breach of Duty of Loyalty*

   The Idaho Supreme Court has firmly established that an employee owes a fiduciary duty of loyalty to his/her employer that prohibits acting on behalf of a competitor during the employment. *Wesco Autobody Supply, Inc. v. Ernest,* 149 Idaho 881, 892, 243 P.3d 1069, 1080 (2010) (affirming district court's denial of former employees' summary judgment motion on breach of fiduciary duty claim based on evidence that defendants recruited their coworkers and

---

[4] AP's Complaint also asserts a cause of action against CIA for Aiding and Abetting Eddy's and Ashbrook's Breach of Duty of Loyalty and for Unfair Competition. AP is not including these counts in its request for a Temporary Restraining Order, but reserves the right to submit evidence relevant to these claims at a preliminary injunction hearing in the event expedited discovery yields further evidence supporting the claims.

"solicited customers before the termination of their employment.") Referring to agency law principles, the Court in *Wesco* reiterated the long-held view that:

> Loyalty to his trust is the first duty which an agent owes to his principal. It follows as a necessary conclusion that the agent must not put himself in such a relationship that his interests become antagonistic to those of his principal.

*Id. citing Jensen v. Sidney Stevens Implement Co,* 36 Idaho 348, 353, 210 P. 1003, 1005 (1922). Applying basic Restatement principles, the Court further clarified this duty imposes an obligation "[t]hroughout the duration of an agency relationship, … to refrain from competing with the principal and from taking action on behalf of or otherwise assisting the principal's competitors." *Id. citing* Restatement (Third) of Agency § 8.04. Relying on these principles, the Idaho Supreme Court held that the trial court correctly found triable issues of fact based on evidence that multiple employees of an autobody supply company left as a group to join a competitor, that certain employees had encouraged others to defect, and that employees had contacted customers to solicit their business before resigning.

The conduct by Eddy and Ashbrook outlined above similarly violated their duty of loyalty to AP by: (1) recruiting their five team members to resign from AP and together open a new office for CIA; (2) directing their Account Manager, Mary Valdivieso, to compile a client contact list while employed by AP for later use at CIA; (3) postponing the transmission of an important AP client's request for new insurance quotes in order to do so with CIA; (4) participating in a group call with their entire 7-member team the day before their mass exodus to coordinate their resignations; (5) providing client BOR change letters to clients designating CIA as their new brokerage while still employed by AP; and (6) as to Eddy, attempting to misuse his AP credentials with Anthem to designate CIA as the broker of record for Eddy's AP clients holding Anthem

insurance policies, while Eddy was still employed by AP. All of those actions were done for the benefit of Defendants and CIA to the detriment of AP in clear violation of the duties Eddy and Ashbrook owed to AP as its employees.

2. *Intentional Interference with Prospective Economic Advantage*

To establish a claim for Intentional Interference with Prospective Economic Advantage, AP must demonstrate (1) the existence of a valid economic expectancy, (2) knowledge of the expectancy by the interferer, (3) intentional interference inducing termination of the expectancy, (4) the interference was wrongful by some measure beyond the fact of the interference itself, and (5) damages. *Wesco Autobody Supply, Inc.*, 149 Idaho at 893, 243 P.3d at1081. In addressing these elements, courts make clear that "the knowledge element may be satisfied by actual knowledge of the prospective [economic advantage] or by *knowledge of facts which would lead a reasonable person to believe that such interest exists.*" *Id.*, 149 Idaho at 894, 243 P.3d at 1082 (emphasis in original, internal citation and quotation omitted).

AP has evidence sufficient to establish each of these elements. First, there is no doubt that AP has a valid expectation of continued business with its insureds. AP makes significant efforts to maintain and expand its client relationships. It is not uncommon for brokers to change firms, and when that happens AP is typically able to retain the clients serviced by the departing broker by transitioning their accounts to other employees. Harper Decl. ¶ 59. Moreover, Employee Benefits insurance is unique and much less prone to client turnover. *Id*. That is because to service a company's insurance needs for dozens, hundreds, or in some cases thousands of employees requires significant knowledge of the client's operations, generates a massive number of records for the underlying insureds, and requires constant attention as employee coverage issues arise. *Id*. For this reason, it is uncommon for clients to change brokers. Absent Defendants' interference,

there is every reason to believe that the business would have remained with AP. *Id*.

Second, as the employees responsible for maintaining these relationships on behalf of AP, Eddy and Ashbrook were obviously aware of AP's expectation of continued business with its clients. It was literally their job. And CIA clearly knew or had reason to believe this as well. That is evident through the press release CIA published the day after hiring the group of employees announcing that they were all formerly AP brokers and that they were hired to launch CIA's West Coast office and expand its Employee Benefits practice. In other words, CIA's press release admits that these employees were not hired to service CIA's existing clients, but instead were expected to open a brand-new office where CIA previously did not operate. CIA did so with the understanding and expectation that these new employees would generate business on day 1 through the client relationships they had developed as AP employees.

Third, there is ample evidence of wrongful interference through the efforts of Eddy, Ashbrook, and their team to facilitate the transition of clients before they resigned, as outlined above. CIA participated in that conduct by allowing its agents to use client contact information taken from AP to send emails announcing CIA's hiring of Eddy's team. CIA similarly facilitated its agents' submission of BOR letters that it reasonably should have known were signed by clients before Eddy's and Ashbrook's employment with AP ended. The damage associated with all this activity is beyond dispute – Defendants are improperly and unfairly diverting AP's clients who generate substantial revenue, and taking with them the goodwill that AP has built over years of dedicated service to its clients and which it relies upon to grow its business.

### B.  AP will Suffer Irreparable Harm Absent Injunctive Relief.

In addition to ultimately prevailing on the merits of its claim, AP faces immediate and irreparable harm unless Defendants are enjoined. A plaintiff may obtain a temporary restraining

order or preliminary injunction when the plaintiff can "demonstrate immediate threatened injury." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). "Irreparable harm exists where monetary damages provide inadequate relief." *Sky Cap. Grp., LLC v. Rojas*, No. 1:09-CV-00083-EJL, 2009 WL 1370938, at *11 (D. Idaho May 14, 2009). The plaintiff "must establish that irreparable harm is likely, not just possible, in the absence of an injunction." *Planned Parenthood of the Great Nw. & the Hawaiian Islands v. Wasden*, 350 F. Supp. 3d 925, 935 (D. Idaho 2018) (citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). Here, irreparable harm to AP without injunctive relief is not just likely, it is guaranteed.

The Ninth Circuit and several courts in this district have found that the loss of customers, prospective business, and customer goodwill is sufficient to demonstrate irreparable harm. *See Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir.1991) (damage to the reputation or goodwill, because it is difficult to calculate, qualifies as irreparable harm) (*BrightView Landscape Dev., Inc. v. Howard*, No. 1:25-CV-00240-BLW, 2025 WL 1345080, at *3 (D. Idaho May 8, 2025) (irreparable harm where employee initiated contact with former employer's customer in violation of non-solicitation agreement, and that former employer had already lost one customer as a result of the conduct.)

Here, the harm AP faces is irreparable because it has no way to repair the loss of client goodwill associated with of the sudden departure of an entire team who together serviced dozens of clients generating millions in revenue. Harper Decl. ¶ 60. AP will not only have to replace its employees, but will have to rebuild an entire office to attempt to maintain relationships with the clients that Defendants wrongfully solicited while still employed by AP. *Id*. AP's reputation relies

upon the relationships that its brokers and their support staff foster with clients. And AP will lose the ability to rebuild those relationships with a new team (which it is ready and able to provide) once the clients leave due to Defendants improper solicitations. *Id.*

In addition, the timing of these events threatens to undermine AP's ability to retain its clients. *Id.* ¶ 61. Work on employer-provided insurance renewals typically begins to take place over the next few weeks.[5] *Id.* Once that process is underway and client HR personnel begin working with their brokers to gather employee paperwork and submit request for quotes to insurers, those clients will be essentially married to their current broker. *Id.* Accordingly, injunctive relief is needed now to prevent the concrete from setting with respect to clients that Defendants have wrongfully solicited. Finally, any damages associated with the loss of these clients would be difficult if not impossible to calculate given that these relationships not only generate revenue, but organically lead to growth and new customers.

Just as in *BrightView* where the court found irreparable harm, Defendants' wrongful conduct has already caused the loss of four clients. Defendants are likely processing more BOR change letters that once processed by the carriers will convert those clients to CIA. Carriers are right now processing BOR letters submitted by Defendants, that were signed or submitted to clients while Eddy was still employed with AP. This means that over the next few days AP's status as the broker for clients will be terminated without immediate injunctive relief.

**C.  <u>The Balance of the Equities and the Public Interest Favor Relief.</u>**

Here, the balance of equities favors relief. As demonstrated above, AP will suffer irreparable harm through the loss of customers, goodwill and damage to its reputation with the

---

[5] It was no coincidence that Valdivieso emailed nearly two dozen clients (with cc to Eddy and Ashbrook) the week before she left and after she filled out onboarding forms for CIA to remind the clients that renewal season was on the horizon. *See supra.*

PLAINTIFF ASSUREDPARTNERS OF COLORADO, LLC'S MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY - 19

clients and in the area previously serviced by Eddy, Ashbrook, and their team. In comparison, preventing Defendants from benefiting from breaching their duties to AP and tortiously interfering with AP's customer relationships is not a hardship. Rather, AP merely seeks to return the parties to the status quo before Defendants coordinated with CIA to move their business to CIA while still employed by AP. Had Defendants exited fairly, without violating their duties to AP, they would have been able to freely compete for clients. But the unfair advantage Defendants have attempted to garner through their pre-resignation coordination and competition cannot be permitted.

Finally, "[w]hen the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one of the favors granting or denying the'" temporary restraining order. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009). Here, the requested temporary injunction is narrow and any effect on non-parties is limited. Any clients wrongfully solicited by Defendants will continue to be serviced by AP, just as they have been for years. Moreover, the public interest is served by preventing parties from benefitting from unlawful conduct.

## IV. GOOD CAUSE EXISTS TO PERMIT EARLY LIMITED DISCOVERY

This Court may, on a showing of good cause, permit early discovery and allow AP to take depositions on a shortened time frame. A "good cause" standard applies to a party seeking expedited discovery. *Allcare Dental Mgmt., LLC v. Zrinyi*, No. CV-08-407-S-BLW, 2008 WL 4649131, at *1 (D. Idaho Oct. 20, 2008). "Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Id.* (*quoting Semitool, Inc. v. Tokyo Electron America,* 208 F.R.D. 273, 276 (N.D.Cal.2002))*.*

Good cause exists to allow limited discovery now because: (1) the proposed discovery is

PLAINTIFF ASSUREDPARTNERS OF COLORADO, LLC'S MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY - 20

necessary for the Court to consider AP's request for a preliminary injunction; (2) the proposed request for documents is narrowly focused on Defendants' pre-resignation client solicitation and employee recruitment efforts; (3) the burden on Defendants is only slight, as the items requested are easily accessible and limited; and (4) the request is made earlier than typical discovery but not earlier than necessary to investigate the exigent circumstances Defendants' created.

Moreover, that several members of Eddy's team were deleting documents and emails in bulk leading up to their departure necessitates immediate steps be taken to preserve their documents. For that reason, AP's expedited discovery requests include the appointment of a neutral forensic examiner to collect Defendants' personal and business devices and email accounts and to search for relevant material. This is needed not just because of the deletion that has already occurred, but because Eddy used his personal devices for AP work, against AP's express policies. Accordingly, it is likely that he maintains significant confidential information belonging to AP that he has not yet returned.

Courts regularly authorize expedited discovery in aid of preliminary injunction hearings, especially where, as is true here, the contemplated discovery is narrow and essential. See, e.g., *NobelBiz, Inc. v. Wesson, No.* 14cv0832 W(JLB), 2014 WL 1588715, at *1-2 (S.D. Cal., Apr. 18, 2014) (*citing Interserve, Inc. v. Fusion Garage PTE, Ltd*., 2010 WL 143665, at *2 (N.D. Cal., Jan. 7, 2010)). The limited discovery that AP seeks to conduct for purposes of the preliminary injunction hearing will better enable the Court to evaluate the parties' positions and allow the parties to prepare a streamlined presentation of evidence at the preliminary injunction hearing, as opposed to engaging in a first-time, painstaking cross examination of Defendants at that hearing. Finally, and most importantly, the expedited deposition and document discovery will enable the Court to fashion a suitable equitable remedy to protect AP from further irreparable harm.

## V.    CONCLUSION

For all the forgoing reasons, AP respectfully requests that this Court (a) enter the proposed TRO to remain in place until the preliminary injunction hearing; and (b) permit the requested expedited discovery to be completed prior to such hearing.

Dated this 9th day of July, 2025.

FISHER & PHILLIPS, LLP


By: ___/s/ Usama Kahf_____
USAMA KAHF, ESQ., CSB #266443
(pending *pro hac vice*)
2050 Main Street
Suite 1000
Irvine, CA 92614


ELAM & BURKE, PA


By: ___/s/ Jaclyn T. Gans_____
Matthew L. Walters, ISB #6599
Jaclyn T. Gans, ISB #9291
251 E. Front Street, Suite 300
Post Office Box 1539
Boise, ID 83701

*Attorneys for Plaintiff, AssuredPartners of Colorado, LLC*